**Richard J. LEE, and Marlene Lee, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 67–C–324.**

United States District Court E. D. Wisconsin.

Aug. 6, 1969.

---

6. Footnote 1, supra.

7. The court takes into account the cost of decedent's own living expenses and other expenses.

James R. Mattison, Milwaukee, Wis., for plaintiffs.

Johnnie M. Walters, Asst. Atty. Gen., by David A. Wilson, Jr., and Richard J. Sideman, Attys., Dept. of Justice, Washington, D. C., and Robert J. Lerner, U. S. Atty. and Thomas R. Jones, Asst. U. S. Atty., Milwaukee, Wis., for defendant.

## OPINION AND ORDER

REYNOLDS, District Judge.

This action is a suit for refund of additional assessments on plaintiffs' joint income tax returns for 1963 and 1964. This court has jurisdiction of such a suit pursuant to 28 U.S.C. § 1346. The matter was tried to this court, sitting without a jury, and post-trial briefs have been submitted by counsel. The court is now prepared to make its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### FACTS

Plaintiffs, Richard J. Lee and Marlene Lee, husband and wife, reside in the Eastern District of Wisconsin. In 1958, Richard J. Lee (hereafter "Lee") and one Jerome Golner (hereafter "Golner") were employed as tool and die makers on the night shift at A. O. Smith Corporation in Milwaukee. Sharing a mutual hobby in shotgun shooting, they decided to make a shotgun shell reloading tool for their own use. After designing the same and experimenting with various models, they found that their design was much simpler than anything on the market, had a market potential, and could be manufactured and sold for less than competitive devices. Lacking manufacturing facilities, they subcontracted the manufacture, then inspected, assembled, and packaged the same in their homes. A joint application for a patent was filed, and the device—the Lee Loader for Shotgun Shells—was marketed on a part-time basis. A partnership return was filed for the year 1958, and the income was split equally between the men. Net income from the partnership for 1958 was $3,479.00. By this time, a working model of the Lee Loader for Shotgun Shells had been developed and manufactured, and the device had been reduced to actual practice.

In 1959, Golner had eight years of seniority at A. O. Smith Corporation and continued working full time. How-

ever, Lee, who had no seniority, was laid off and put full time into the partnership business. The partnership originally operated under the name and style of Lee Engineering but because of a similarity of names was changed to Lee Custom Engineering.

By May of 1959, the business had grown to a point where it became necessary to devote more time to it. Golner was unwilling to give up his relatively good job, as he had five children to support and felt that there were insufficient earnings from the partnership business to support two families. No written agreement was entered into, but the partnership was terminated as of May 31, 1959. The two men attempted to settle on some sort of an arrangement, and it was agreed that Golner would withdraw completely from the business, and Lee was to operate it as his own. The partnership profits to date were split between the two men. Golner gave Lee all of his rights, as an inventor of the device and as joint applicant for the patent, to manufacture, sell, and market the Lee Loader for Shotgun Shells; and Lee was to hold Golner harmless from liability arising from such activities. It was further agreed that if Lee went broke, then he owed Golner nothing, but if he ever made it big, he could then pay Golner something.

The business continued from June 1, 1959 until October 31, 1962, as a sole proprietorship under the firm name and style of Lee Custom Engineering. Sales for the balance of 1959 amounted to an additional $25,625.00, and the total sales for the year amounted to $33,368.00. In 1960, sales amounted to approximately $51,000.00 and in 1961 to approximately $98,000.00. Sales for 1962 through October 31 amounted to approximately $83,-000.00.

Golner continued to work at A. O. Smith Corporation. Lee operated the sole proprietorship, and the men remained friends during the period mentioned above. Golner received nothing from the manufacture, sale, and distribution of the invention. In mid 1962, Golner resigned his position at A. O. Smith Corporation and went to work for Lee as a full-time employee on a salary basis. Up until 1962, the accounting records were kept by one Mrs. Steckling. As the business grew, Lee retained the services of a certified public accounting firm.

Business practically doubled in volume each year from 1959 to 1962. Lee spoke to Robert Meier of the certified public accounting firm and to an attorney about the advantages of incorporation. There were a number of business purposes involved in incorporation. Lee had been unable to obtain products liability insurance while operating as a sole proprietor. The company was engaged in the hazardous occupation of selling reloading equipment to people who could conceivably injure themselves. Lee was interested in the continuation of the business in the event of his death or disability. He was only 32 years of age, his wife was incapable of running the business, there were five small children, and Lee felt that incorporation would be beneficial for the protection of his family. Lee had been engaged full time in the clerical and production details of the business, and was interested in obtaining more free time to work on inventions. After discussing incorporation with the accountant and the attorney, Lee was interested in the tax benefits both of a corporation generally and of 26 U.S.C. § 1235.

In discussing the future course of the business with the attorney and the accountant, it was determined that Lee should license all substantial rights under the shotgun shell loader patent to some person, firm, or corporation. Both the accountant and the attorney suggested various firms as Lee did not have a candidate for this job. Later on it was decided that a perfectly logical person would be Mr. Golner himself because of his experience in running the business, the fact that he was familiar with every phase of the operation, and by reason

of the fact that Lee was indebted to Golner for the arrangement made at the time the partnership was broken up to give him something if the operation were successful.

On September 11, 1962, a patent for the Lee Loader for Shotgun Shells was issued in the joint names of Golner and Lee. However, because in 1959 Golner had already transferred to Lee all his rights to manufacture, sell, and market the device, Golner had only a bare legal title in the patent at the time it issued.

A pre-incorporation agreement was entered into on October 23, 1962, by Lee and Golner which provided, among other things, that Lee was to form a corporation to be known as Lee Custom Engineering, Inc.; that there would be specific restrictions on the sale of stock (i.e., a closed corporation); and that Lee would pay the sum of $2,500.00 for 250 shares of stock which would constitute the initial operating capital of the corporation. It further provided that Lee would transfer 190 shares of stock (76%) to Golner and Golner would assign all of his right, title, and interest in and to the letters of patent to Lee. This left Lee with 24% of the outstanding stock, a percentage which has not changed. The agreement also provided that Lee would assign, by license, to the corporation the exclusive right of manufacture, sale, and distribution of the shotgun loader on a royalty basis. The license agreement was to run for the life of the patent unless the corporation defaulted in its obligations thereunder. Also during the life of the patent, or as long as the corporation was not in default under the license agreement, Lee was to be president of the corporation and a member of the board of directors.

The pre-incorporation agreement was executed. On November 1, 1962, a corporation was organized, and Golner, Lee, and the accountant, Robert Meier, were elected directors. Lee was elected president-treasurer, and Golner, vice-president and secretary. Thereafter, also on November 1, 1962, an exclusive license agreement was entered into by Lee and Lee Custom Engineering, Inc., transferring to the corporation all of Lee's right, title, and interest in and to the patent pertaining to the Lee Loader for Shotgun Shells.

Meanwhile, Lee had been working on another invention—the Lee Loader for Center Fire Cartridges—and had applied for a patent. On the basis of the application, in 1963 Lee entered into another exclusive license agreement with the corporation as to this invention.

On December 31, 1964, Golner decided to enter the machine shop business for himself and resigned from the company. To finance his new business, Golner wished to sell 150 shares of his stock. The company declined to exercise its option to purchase Golner's stock, so in February 1965, these shares were purchased by Gordon Schanzer. This gave Schanzer 60% of the outstanding stock, while Golner held 16% and Lee continued to own 24%. At the time of the trial, these percentages had not changed. Schanzer, at the time of the stock purchase, took over Golner's duties and became an officer and director of the corporation.

Lee filed his income tax returns jointly with his wife on a calendar year basis. In his returns for the years 1963 and 1964, he treated his income from the licensing agreements as long term capital gains. After an audit of these returns by the Internal Revenue Service, the capital gains treatment was disallowed, and as a result of holding that the royalty income was taxable as ordinary income, plaintiffs were assessed a total of $34,558.66 in additional taxes and interest. The present suit was instituted after plaintiffs' claims for refund were disallowed by the District Director.

Lee contends that he has fully complied with the provisions of 26 U.S.C. § 1235 and, consequently, is entitled to treat the royalty income received in 1963 and 1964 as long term capital gains.

## DOES 26 U.S.C. § 1235 ALLOW LEE TO TREAT ROYALTIES FROM THE PATENTS ASSIGNED TO LEE CUSTOM ENGINEERING, INC., AS CAPITAL GAINS?

The statutory provisions under which Lee claims he was entitled to treat the royalty payments he received as long term capital gains provide in relevant part as follows:

26 U.S.C. § 1235. "Sale or exchange of patents

"(a) General.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(2) contingent on the productivity, use, or disposition of the property transferred.

"(b) 'Holder' defined.—For purposes of this section, the term 'holder' means—

"(1) any individual whose efforts created such property, or

"(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

"(A) the employer of such creator, nor

"(B) related to such creator (within the meaning of subsection (d) ).

\*　\*　\*　\*　\*　\*

"(d) Related persons.—Subsection (a) shall not apply to any transfer, directly or indirectly, between persons specified within any one of the paragraphs of section 267(b) ; except that,

in applying section 267(b) and (c) for purposes of this section—

"(1) the phrase '25 percent or more' shall be substituted for the phrase 'more than 50 percent' each place it appears in section 267(b), and

"(2) paragraph (4) of section 267 (c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants."

Insofar as it is applicable to the facts before this court, 26 U.S.C. § 267 provides as follows:

"§ 267. Losses, expenses, and interest with respect to transactions between related taxpayers

\*　\*　\*　\*　\*　\*

"(b) Relationships.—The persons referred to in subsection (a) are:

"(1) Members of a family, as defined in subsection (c) (4) ;

"(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

\*　\*　\*　\*　\*　\*

"(c) Constructive ownership of stock.—For purposes of determining, in applying subsection (b), the ownership of stock—

\*　\*　\*　\*　\*　\*

"(2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

\*　\*　\*　\*　\*　\*

"(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; and

\*　\*　\*　\*　\*　\*"

As applied to this case, § 1235 requires essentially the following elements in order to qualify for capital gains treatment:

1. A transfer, other than by gift, inheritance, or devise must be made to a person other than a member of the transferor's family or to a corporation in

which transferor owns less than 25% of the stock.

2. The transfer must include all substantial rights in the patent.

3. The transferor must be a "holder" of the rights transferred as that term is defined by the statute. Insofar as it is applicable to this case, the statute defines a "holder" as (a) the individual whose efforts created the invention, or (b) an individual who acquired his interest, in exchange for money or money's worth paid to the creator, prior to actual reduction to practice of the invention.

Each of these elements of § 1235 will be considered in relation to the facts in this case.

## I.

### WAS THERE A TRANSFER AS REQUIRED BY § 1235?

■ The Government takes the position that Lee still in fact controls all the substantial rights under the patents because Lee "controls" the corporation which is the exclusive licensee of the patents. Consequently, argues the Government, there has not been an effective transfer, and Lee is not entitled to the benefits of § 1235.

The legislative history of § 1235 does indicate congressional intent to deny capital gains treatment when the transfer of the patent is between related persons or between a taxpayer and a corporation in which he owns more than a certain percentage of the corporate stock. Originally the percentage of stock which precluded capital gains treatment was 50%. Subsequently, however, the allowed ownership was reduced to 25% of the outstanding stock. P.L. 85–866, § 54 (a) (Sept. 2, 1958). In discussing these limitations, the House Report stated:

> " * * * It is not considered that this limitation will in any way narrow the opportunity of inventors to dispose of their patents through normal business channels; on the other hand, this limitation should prevent possible abuses arising from the sale of pat-

ents within essentially the same economic group." U.S. Code Cong. & Adm. News, 1954, Vol. 3, p. 4423.

The phrase "essentially the same economic group" is apparently the language upon which the Government has seized to justify its interpretation of the statute in this case. Congress, however, apparently considered transfers between "essentially the same economic group" as transfers to a corporation in which 25% or more of the outstanding stock was owned by the transferor. Congress did not at any point in the legislative history of this section indicate an intent to prohibit as a matter of course transfers to a closed corporation. The position the Government now takes requires such an interpretation of the statute.

Clearly, Lee Custom Engineering, Inc., is a closed corporation which is closely held. There are three stockholders—Lee, Golner, and Schanzer. None of the stockholders are related, but all are friends. The board of directors consists of three persons—Schanzer, who owns 60% of the stock; Lee, who owns 24%; and Meier, an accountant, who owns no stock at all. Clearly, Lee's one vote at a board of directors' meeting or 24% vote at a stockholders' meeting is insufficient to control the corporation under applicable Wisconsin law. Ch. 180, Wis. Stats. (1967). There was no evidence presented which suggested Lee was otherwise able to force the other stockholders or directors to do his bidding.

Had Congress wished to prohibit capital gains treatment when the transfer of a patent involved a closed corporation, it could have easily done so. The line Congress chose to draw, however, was ownership of 25% or more of the outstanding stock in a corporation to which the transfer was made. I am unwilling to rewrite the provisions of § 1235 so that transfers to a closed corporation composed of unrelated stockholders and directors are also excluded from capital gains treatment, regardless of the percentage of stock owned by the trans-

feror. The Court of Appeals for the Second Circuit likewise declined to exclude transfers to partnerships in Burde v. C. I. R., 2 Cir., 352 F.2d 995 (1965), cert. denied 383 U.S. 966, 86 S.Ct. 1271, 16 L.Ed.2d 307.

Consequently, I conclude that a valid transfer of both patents by Lee to Lee Custom Engineering, Inc., has occurred.

## II.

## WERE "ALL SUBSTANTIAL RIGHTS" IN BOTH PATENTS TRANSFERRED?

It has not been contested that the exclusive license agreements of both patents in fact gave Lee Custom Engineering, Inc., "all substantial rights" in the patents. The corporation has the exclusive right, for the life of each patent and any extension thereof, to manufacture, sell, and distribute the devices. Lee's power to terminate the exclusive license agreements is predicated only upon a default by the corporation in the terms of the agreements.

I, therefore, find that Lee transferred "all substantial rights" in both patents to Lee Custom Engineering, Inc.

## III.

## WAS LEE A "HOLDER" OF THE RIGHTS IN THE PATENTS AT THE TIME OF TRANSFER?

One statutory definition of a "holder" of substantial rights to a patent is "any individual whose efforts created such property." Section 1.1235–2(d) of 26 C.F.R. clearly indicates an inventor is also a "holder." Lee was the sole inventor of the Lee Loader for Center Fire Cartridges, and the only person named when the letters of patent issued as to this device. It has not been contested that, at the time of the transfer of the rights under the Center Fire Cartridge patent, Lee was the sole "holder" of all the substantial rights, and I so find.

A more difficult problem is presented with regard to the Lee Loader for Shotgun Shells. Both Lee and Golner originally had joint rights in this device as co-inventors. They jointly participated in the invention and jointly filed an application for patent. Clearly, then, as to one-half of all the substantial rights in this patent, Lee was a "holder" by virtue of being "an individual whose efforts created such property."

In addition to the creator of the invention, the statute defines a "holder" as "any other individual who acquired his interest * * * in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention * * *." 26 U.S.C. § 1235(b) (2). Lee acquired all of Golner's substantial rights as a co-inventor of the Lee Loader for Shotgun Shells when they entered into the agreement terminating the partnership. Lee gave Golner consideration in money or money's worth by (1) assuming all further liability arising out of the production of the device, (2) promising to give Golner something if Lee ever "made it big," and (3) dividing all profits to date from the manufacture and sale of the device.

The difficulty, however, is that Lee acquired Golner's interest in May 1959. The device had been reduced to actual practice and, in fact, manufactured and marketed in 1958. Consequently, Lee did not acquire Golner's rights in the device "prior to actual reduction to practice of the invention" and, therefore, is not a "holder" as defined in § 1235 as to Golner's one-half interest in the device. It therefore appears that Lee is not entitled to capital gains treatment under § 1235 as to royalties received pursuant to the one-half interest in the Lee Loader for Shotgun Shells acquired from Golner.

The royalty payments received by Lee on that portion of the interest in the Lee Loader for Shotgun Shells which Lee acquired from Golner must be treated as ordinary income unless capital gains treatment is available under other sections of the statutes.

## IV.

### IS CAPITAL GAINS TREATMENT AVAILABLE TO LEE PURSUANT TO § 1221 OR § 1231(a)?

Section 1231(a) of 26 U.S.C. provides as follows:

"§ 1231. Property used in the trade or business and involuntary conversions

"(a) General rule.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection—

"(1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and

"(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

"In the case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft."

Section 1221 of 26 U.S.C. provides:

"§ 1221. Capital asset defined

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

"(3) a copyright, literary, musical, or artistic composition, or similar property, held by—

"(A) a taxpayer whose personal efforts created such property, or

"(B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;

"(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

"(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political

subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue."

The Government contends that capital gains treatment is not available to Lee under these sections because the interest acquired from Golner was transferred by Lee less than six months after it was acquired. It is not otherwise contended that these sections are inapplicable.

■ The Government asserts that Lee acquired Golner's interest in the Lee Loader for Shotgun Shells in November 1962 when Golner executed a document entitled "Assignment of Patent." Therefore, the Government argues, Lee's transfer of the rights under this patent to Lee Custom Engineering, Inc., in November 1962 was a transfer of property held less than six months and consequently may not properly be considered a capital gain.

The difficulty with this argument is that Lee acquired all of Golner's substantial rights in the Lee Loader for Shotgun Shells in May 1959 when the partnership between Lee and Golner terminated. At the time the letters of patent issued to Lee and Golner, all Golner had was bare legal title in the letters of patent. Golner had already transferred his rights to manufacture, sell, and distribute the invention. Consequently, the "Assignment of Patent" was merely a formal assignment of title. Golner did not possess any other rights in the invention at that time, as Lee had acquired all other rights from him in May 1959.

Since Lee had acquired all substantial rights in the Lee Loader for Shotgun Shells in May 1959, his transfer of such rights to Lee Custom Engineering, Inc., which occurred in November 1962 was a transfer of property held more than six months. I therefore conclude that Lee was entitled to treat royalty payments received pursuant to the interest in the Lee Loader for Shotgun Shells acquired from Golner as long term capital gains because such interest was held by Lee for more than six months prior to transfer.

For all the foregoing reasons, I therefore find:

1. That there was assessed in error against the plaintiffs' 1963 and 1964 joint income tax returns the sum of $10,233.19 for the year 1963, and the sum of $20,444.89 for the year 1964, which assessments, with interest, amounted to $34,558.66 at the time of payment thereof, on January 23, 1967.

2. That the plaintiffs are entitled to a refund of the said payment of $34,-558.66, together with interest and the costs and disbursements of this action.