**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMES C. COOPER; LORELEI M. COOPER, | No. 15-70863 |
| *Petitioners-Appellants*, | Tax Ct. No. 17284-12 |
| v. | |
| COMMISSIONER OF INTERNAL REVENUE, | OPINION |
| *Respondent-Appellee.* | |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted October 4, 2017
Pasadena, California

Filed December 15, 2017

Before: Andrew J. Kleinfeld, Susan P. Graber,
and Morgan Christen, Circuit Judges.

Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Kleinfeld

# SUMMARY[*]

## Tax

The panel affirmed the Tax Court's decision, after a bench trial, on a petition for redetermination of federal income tax deficiencies in which taxpayers sought capital gains treatment of patent-generated royalties pursuant to 26 U.S.C. § 1235(a).

Taxpayer James Cooper is an engineer and inventor whose patents generated significant royalties. He and his wife incorporated and transferred their rights to the patents to Technology Licensing Corporation (TLC), which was formed by taxpayers and two other individuals, Walters and Coulter. If a patent holder, through effective control of the corporation, retains the right to retrieve ownership of the patent at will, then there has not been a transfer of all substantial rights to the patent so as to warrant capital gains treatment of the royalties under § 1235(a). The panel held that the Tax Court permissibly concluded that Mr. Cooper did not transfer "all substantial rights" to the patents to TLC because Walters and Coulter acted at Mr. Cooper's direction, did not exercise independent judgment, and returned patents to Mr. Cooper when requested for no consideration.

Taxpayers claimed a deduction for a nonbusiness "bad debt" pursuant to 26 U.S.C. § 166(d)(1)(B), which allows short-term capital-loss treatment of a loss "where any nonbusiness debt becomes worthless within the taxable year."

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the Tax Court permissibly concluded that the debt had not become "totally worthless."

Finally, the panel upheld the Tax Court's determination that taxpayers failed to meet their burden of showing that they actually relied in good faith on their advisers' judgment so as to avoid accuracy-related penalties under 26 U.S.C. §§ 6662 and 6664.

Judge Kleinfeld dissented as to Section A of the majority opinion regarding the royalty payments as capital gains, joined in Section B as to the bad debt deduction, and observed that the accuracy penalties discussed under Section C would need to be revisited if his view on the royalties were to be accepted. Judge Kleinfeld opined that the better approach to distinguishing "control" from "mere influence" over a corporation is the approach set forth in *Charlson v. United States*, 525 F.2d 1046 (Ct. Cl. 1975) (per curiam), and *Lee v. United States*, 302 F. Supp. 945 (E.D. Wis. 1969): that "control" means the ability to compel what the transferee corporation does.

## COUNSEL

Richard G. Stack (argued) and Dennis N. Brager, Brager Tax Law Group P.C., Los Angeles, California, for Petitioners-Appellants.

Clint A. Carpenter (argued) and Richard Farber, Attorneys, Tax Division; Caroline D. Ciraolo, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Respondent-Appellee.

## OPINION

GRABER, Circuit Judge:

Petitioners James and Lorelei Cooper are married taxpayers who challenge the Commissioner of Internal Revenue's notice of deficiency for tax years 2006, 2007, and 2008. Mr. Cooper's patents generated significant royalties during those years. Petitioners sought capital gains treatment of those royalties pursuant to 26 U.S.C. § 1235(a) on the theory that Mr. Cooper had transferred to a corporation "all substantial rights" to the patents. After a bench trial, the Tax Court disagreed, finding that Mr. Cooper effectively controlled the recipient corporation such that he had not transferred all substantial rights to the patents. The Tax Court also found that Petitioners could not take a bad debt tax deduction in 2008 because the debt at issue had not become worthless during that year, and that Petitioners had not established reasonable cause to avoid accuracy penalties arising from their underpayment. Because the Tax Court accurately applied the law and did not clearly err in its factual findings, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Cooper is an engineer and inventor. He is the named inventor on more than 75 patents in the United States. His patents are primarily for products and components used in the transmission of audio and video signals. Petitioners are co-trustees of a family trust, referred to as the "Cooper Trust." In 1983, Petitioners incorporated Pixel Instruments Corporation ("Pixel"). Mr. Cooper was president, and Ms. Cooper held various positions, including vice president. Petitioners wholly owned Pixel until 2006.

In 1988, Mr. Cooper and Pixel entered into a commercialization agreement with Daniel Leckrone. Mr. Cooper and Pixel assigned their patents to a licensing company formed by Leckrone, in exchange for royalty payments arising from the commercialization of the patents. The arrangement brought significant tax benefits to Petitioners. Because Petitioners had transferred "all substantial rights" to the patents to the licensing company, 26 U.S.C. § 1235(a) permitted Petitioners to treat the payments from the licensing company as capital gains. But in 1997, after disputes with Leckrone, Mr. Cooper terminated the commercialization agreement. All of Mr. Cooper's patent rights reverted to his assignee pursuant to a settlement and arbitration.

Understandably, Petitioners sought to retain the tax benefits afforded by § 1235 and, to that end, they sought legal advice from Gordon Baker. Baker advised them that they could set up a licensing company to which to transfer the patents, so long as they complied with two requirements that are relevant here. First, he advised them that, pursuant to § 1235(c),[1] they could not own 25 percent or more of the company. Second, he advised them that, regardless of formal ownership, they could not effectively control the new company. The prohibition on effective control had been discussed at length in *Charlson v. United States*, 525 F.2d 1046, 1053 (Ct. Cl. 1975) (per curiam).

---

[1] Section 1235(c) formerly was labeled § 1235(d). We use the present-day citation.

Petitioners, joined by Lois Walters and Janet Coulter, incorporated Technology Licensing Corporation ("TLC").[2] Walters is Ms. Cooper's sister, and Coulter is a long-time friend of Ms. Cooper and Walters. During all relevant times, Coulter and Walters lived in Ohio, and both held full-time jobs unrelated to TLC. Neither Coulter nor Walters had any experience in patent licensing or patent commercialization before their involvement with TLC.

Consistent with Baker's advice, Petitioners, as co-trustees of the Cooper Trust, owned only 24% of the TLC stock; Walters owned 38%; and Coulter owned 38%. Walters was president and chief financial officer, Ms. Cooper was vice president, and Coulter was secretary.

In 1997, Mr. Cooper and Pixel entered into agreements with TLC. Under the TLC agreements, Mr. Cooper and Pixel transferred to TLC all rights to certain patents, and TLC agreed to pay Mr. Cooper and Pixel royalty payments using a formula that relied on percentages of gross and net proceeds received from licensing the patents. During 2006, 2007, and 2008—the years at issue here—Mr. Cooper received royalty payments pursuant to the TLC agreements, and Petitioners treated those payments as capital gains.

During 2008, Petitioners also claimed a deduction on their 2008 tax return for a nonbusiness "bad debt" pursuant to

---

[2] In 2003, Petitioners moved from California to Nevada. They then incorporated a second Technology Licensing Corporation in that state, with the same board membership and the same stock ownership. The two corporations merged in 2004, with the Nevada corporation emerging as the surviving corporation. We follow the Tax Court's convention of referring to both the original corporation and the surviving corporation as "TLC."

26 U.S.C. § 166(d)(1)(B), which allows short-term capital-loss treatment of a loss "where any nonbusiness debt becomes worthless within the taxable year." The debt arose from a working capital promissory note from the Cooper Trust to Pixel. At the end of 2008, the outstanding balance on the promissory note was a little more than $2 million, and Mr. Cooper concluded that Pixel could not pay the outstanding balance.

The Commissioner issued a notice of deficiency to Petitioners. Relevant here, the Commissioner disagreed that the royalty payments from TLC qualified as capital gains; he disagreed that the Pixel promissory note debt qualified as a bad debt deduction; and he assessed penalties for those errors. Petitioners sought review by the Tax Court. After a trial, the Tax Court agreed with the Commissioner on all three points, and the court ordered Petitioners to pay deficiencies and penalties totaling approximately $1.5 million. Petitioners timely appeal.[3] *See* 26 U.S.C. § 7482(a)(1) (permitting appeals from the Tax Court to the applicable circuit court).

## STANDARDS OF REVIEW

"We review decisions of the Tax Court under the same standards as civil bench trials in the district court. Therefore, conclusions of law are reviewed de novo, and questions of fact are reviewed for clear error." *Johanson v. Comm'r*, 541 F.3d 973, 976 (9th Cir. 2008) (internal quotation marks omitted).

---

[3] The Tax Court ruled in favor of Petitioners on a separate issue; the Commissioner did not cross-appeal. That ruling therefore is final.

## DISCUSSION

"Determinations made by the Commissioner in a notice of deficiency normally are presumed to be correct, and the taxpayer bears the burden of proving that those determinations are erroneous." *Merkel v. Comm'r*, 192 F.3d 844, 852 (9th Cir. 1999). The burden shifts back to the Commissioner in certain circumstances, 26 U.S.C. § 7491(a), but the Tax Court held that Petitioners have neither asserted nor proved that they have met those requirements. On appeal, Petitioners do not challenge the Tax Court's conclusion that they bear the burden of proof.

Petitioners challenge the Tax Court's rulings on (A) the treatment of royalty payments as capital gains; (B) the treatment of the Pixel loan as a bad debt; and (C) the imposition of penalties.

### A. *Royalty Payments as Capital Gains*

The Tax Code generally treats income derived from a capital asset as ordinary income. By contrast, the Tax Code generally treats the proceeds from the sale of a capital asset more favorably, as capital gains. Real property provides a good example: If a homeowner rents a house, the rents are ordinary income; but if the homeowner sells the house, the proceeds from the sale are capital gains. Patents do not fit neatly within that dichotomy, because patent holders often sell all substantial rights to a patent in exchange for periodic payments contingent on the patent's productivity. But because that payment arrangement appears so similar to rent, the Commissioner originally treated the proceeds from such exchanges as ordinary income—even though the patent holder had divested all meaningful property rights in the

patent. *See Fawick v. Comm'r*, 436 F.2d 655, 659–61 (6th Cir. 1971) (describing this history).

In 1954, Congress responded by enacting 26 U.S.C. § 1235. Subsection 1235(a) provides:

> A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent . . . by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year, regardless of whether or not payments in consideration of such transfer are–
>
> (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or
>
> (2) contingent on the productivity, use, or disposition of the property transferred.

Accordingly, if a patent holder transfers "all substantial rights to a patent," then the resulting royalty payments are treated as capital gains, because the patent has been "sold." By contrast, if a patent holder retains substantial rights to a patent and merely licenses the patent, then the resulting payments are not treated as capital gains, because the patent has not been "sold." The key consideration is whether the patent holder "transfer[red] . . . all substantial rights" to the patent. *Id.*

Petitioners urge us, for the first time on appeal, to determine whether there has been a transfer of all substantial rights by looking *solely* to the formal documents, without

regard to the practical realities of the transaction.**[4]** We decline the invitation. A bedrock principle of tax law—now and in 1954—is that substance controls over form. *See, e.g.*, *United States v. Eurodif S.A.*, 555 U.S. 305, 317–18 (2009) ("[I]t is well settled that in reading regulatory and taxation statutes, form should be disregarded for substance and the emphasis should be on economic reality." (internal quotation marks omitted)); *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255 (1939) ("In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding."). Nothing in § 1235 suggests that Congress intended a different rule to apply here. To the contrary, considerable legal authority supports our conclusion that, when determining whether there has been a transfer of all substantial rights, we must look beyond the bare form of the transaction.

Acting pursuant to an express statutory delegation, 26 U.S.C. § 7805(a), the Secretary of the Treasury ("Secretary") has promulgated regulations concerning the statutory phrase "all substantial rights to a patent." 26 C.F.R. § 1.1235-2(b). We defer to the Secretary's regulations. *See Kueneman v. Comm'r*, 628 F.2d 1196, 1201 (9th Cir. 1980) ("The Secretary has broad authority to promulgate reasonable regulations to implement the revenue laws . . . ."); *Comm'r v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981) ("Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue

---

**[4]** The issue is purely one of law, and the parties have briefed it to us. We exercise our discretion to reach the issue, despite Petitioners' failure to raise it before the Tax Court. *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985).

statutes.'" (quoting *Comm'r v. S. Tex. Lumber Co.*, 333 U.S. 496, 501 (1948))). The pertinent Treasury Regulation states: "The circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered in determining whether or not all substantial rights to a patent are transferred in a transaction." 26 C.F.R. § 1.1235-2(b)(1). That interpretation finds support in the legislative history, specifically a Senate Finance Committee report that stated:

> It is the intention of your committee to continue this realistic test, [developed under prior case law,] whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee . . . .

S. Rep. No. 83-1622, at 440 (1954), *as reprinted in* 1954 U.S.C.C.A.N. 4621, 5083. Not surprisingly, then, we previously have described the inquiry in practical terms: "What did the taxpayer *actually* give up by the transfer; that is, was there an *actual* transfer of the monopoly rights in a patent . . . ." *Kueneman*, 628 F.2d at 1199 (emphases added and original emphasis omitted) (quoting *Mros v. Comm'r*, 493 F.2d 813, 816 (9th Cir. 1974) (per curiam)).

In *Charlson*, 525 F.2d 1046, the United States Court of Claims described how the principle applies in a case involving a transfer of patent rights to a corporation. In that case, the inventor formally transferred all substantial rights to certain patents to a corporation that was owned by the inventor's close friends and associates. *Id.* at 1048–49.

Section 1235(c) provides that royalties from a patent transfer are not taxable as capital gains if the recipient is a "related" person or entity.    The court held that § 1235(c)'s requirements concerning formal ownership had been met, but the court "stressed that § 1235[(c)] was not intended to be an exclusive or exhaustive statement of the impact of control over a § 1235(a) transaction." *Id.* at 1053.  It is "clear," the court held, "that retention of control by a holder over an unrelated corporation can defeat capital gains treatment, if the retention prevents the transfer of 'all substantial rights.'" *Id.* "This is because the holder's control over the unrelated transferee . . . places him in essentially the same position as if all substantial rights had not been transferred." *Id.*; *see also id.* (describing Congress' "obvious intent of having a transferor's acts speak louder than his words in establishing whether a sale of a patent has occurred").

We agree:  If a patent holder exercises control over the recipient corporation such that, in effect, there has not been a transfer of all substantial rights in the subject patent(s), then the requirements of § 1235(a) are not met, even if the documents describing the transfer formally assign all substantial rights.  The key inquiry remains whether, as a practical matter, the transferor shifted all substantial rights to the recipient.   Mere influence by the patent holder is insufficient to defeat § 1235(a) treatment, as is control by the patent holder of aspects of the corporation apart from the patent rights.  A patent holder who formally transfers all substantial patent rights to a qualifying corporation is entitled to the benefits of § 1235(a) unless, through effective control of the corporation, he or she did not effectively transfer all substantial rights to the patent(s).

Importantly, "[t]he retention of a right to terminate the transfer at will is the retention of a substantial right for the purposes of section 1235." 26 C.F.R. § 1.1235-2(b)(4). Accordingly, if a patent holder, through effective control of the corporation, retains the right to retrieve ownership of the patent at will, then there has not been a transfer of all substantial rights. Stated differently, if the recipient corporation stands ready, as a practical matter, to return ownership of the patent to the patent holder at the holder's direction, then there has not been a transfer of all substantial rights.

Here, the Tax Court found, and we agree, that Petitioners complied with the formal requirements of § 1235. Mr. Cooper formally transferred all substantial rights to the patents to TLC, and Petitioners owned less than 25 percent of TLC. The Tax Court further found, however, that Mr. Cooper effectively controlled TLC within the meaning of *Charlson* such that, in effect, there had not been a transfer of all substantial rights to the patents. For the reasons that follow, we hold that the Tax Court did not clearly err.

The Tax Court found that Walters and Coulter—the two shareholders other than the Cooper Trust—exercised no independent judgment and acted at Mr. Cooper's direction. "During the years at issue, [Walters' and Coulter's] duties as directors and officers consisted largely of signing checks and transferring funds as directed by TLC's accountants and signing agreements as directed by TLC's attorneys." "[S]ubstantially all of TLC's decisions regarding licensing, patent infringement, and patent transfers were made either by Mr. Cooper or at his direction." Walters and Coulter "acted in their capacities as directors and officers of TLC at the direction of Mr. Cooper. They did not make independent

decisions in accordance with their fiduciary duties to TLC or act in their best interests as shareholders."

Those findings strongly suggest that TLC would take practically any action requested by Mr. Cooper—including the return of patent rights—without regard to the interests of TLC's shareholders and without regard to the personal interests of Walters and Coulter. But the Tax Court was not required to speculate as to whether, upon Mr. Cooper's request, TLC would return valuable patent rights to Mr. Cooper; that event in fact occurred. In 2006, upon request, TLC returned valuable patent rights to Mr. Cooper *for no consideration*. Mr. Cooper quickly commercialized the patents through a separate entity, which received $120,000 in revenue.

In sum, the Tax Court permissibly concluded that Walters and Coulter acted at Mr. Cooper's direction; did not exercise independent judgment; and, when requested, returned patents to Mr. Cooper for no consideration. Given that Walters and Coulter acquiesced, without question or explanation, in the rescission of the transfer of certain patents, there is no reason to think that they would have objected to the rescission of any other transfer of patents. Because the right to retrieve ownership of the patent is a substantial right, the Tax Court did not clearly err in ruling that Mr. Cooper did not transfer "all substantial rights" to the patents.

We respectfully part ways from the dissent's thoughtful analysis of this issue and offer the following observations in response.

For all the reasons described above, the inquiry into whether there was a transfer of all substantial rights is a

practical one, not merely a formalistic or legalistic one. We therefore reject the dissent's suggestion that we must ask whether, in theory, TLC could have declined to transfer the patents back to Mr. Cooper; instead, we must ask whether, as a practical matter, Mr. Cooper retained the ability to retrieve the patents at will. Similarly, whether Mr. Cooper hypothetically could have forced TLC to comply with his wishes on other matters is beside the point.

We recognize that there is a difference between mere influence to control sufficient to defeat § 1235(a) tax treatment. Reasonable minds may differ on where a particular situation lies. Having examined the record developed at trial in this case, and reviewing for clear error, we hold only that the Tax Court's conclusion was a permissible one. Relatedly, we disagree with the dissent that the facts of *Charlson* require a different result here. The officers of the corporation in *Charlson* exercised independent judgment, and the corporation never returned patents to the inventor without consideration.

Finally, we emphasize that our analysis is limited solely to the tax consequences of Petitioners' business arrangements. Allowing an inventor to have effective control of the recipient corporation very well may be a smart business practice in some circumstances. We hold only that, if the patent holder effectively controls the corporation such that he or she did not transfer all substantial rights to the patents, then the tax treatment allowed by § 1235 does not apply.

B. *Bad Debt Deduction*

We review for clear error the Tax Court's finding of the worthlessness of a debt. *L.A. Shipbuilding & Drydock Corp.*

*v. United States*, 289 F.2d 222, 228–29 (9th Cir. 1961); *accord Cox v. Comm'r*, 68 F.3d 128, 131 (5th Cir. 1995). The taxpayer bears the burden of proving "that the debt became worthless within the tax year." *Andrew v. Comm'r*, 54 T.C. 239, 244–45 (1970). "The year a debt becomes worthless is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. Petitioner must establish sufficient objective facts from which worthlessness could be concluded; mere belief of worthlessness is insufficient." *Aston v. Comm'r*, 109 T.C. 400, 415 (1997) (citation omitted). The debt must "become totally worthless, and no deduction shall be allowed for a nonbusiness debt which is recoverable in part during the taxable year." 26 C.F.R. § 1.166-5(a)(2). A taxpayer need not have initiated legal action against the debtor, but "he does have the burden of establishing that such an action, when considered in the light of objective standards, would in all probability have been entirely unsuccessful." *Dustin v. Comm'r*, 467 F.2d 47, 48 (9th Cir. 1972) (footnotes omitted).

The Tax Court found that, contrary to Petitioner's assertion, the debt on Pixel's promissory note did not become "worthless" in July 2008. 26 U.S.C. § 166(d)(1)(B). The court reasoned:

> Pixel had total yearend assets each year from 2008 through 2012 in excess of $172,000, including more than $319,000 in assets in 2011 and 2012. It appears to us that Pixel remained a going concern well past 2008. . . . Pixel experienced a decline in its business in 2008, but its gross receipts increased in 2009. Petitioners as cotrustees of the Cooper Trust continued to advance funds

to Pixel under the terms of the promissory note throughout 2008. Indeed, petitioners advanced $148,255 to Pixel under the terms of the promissory note between July and December 2008. We do not find it credible that petitioners would have advanced nearly $150,000 to Pixel after July 2008 if they believed the promissory note had been rendered worthless in July 2008 . . . . The evidence shows that Pixel had substantial assets at the end of the 2008 tax year and that its gross receipts increased in 2009. Moreover, at the very least, Pixel was entitled to an indefinitely continuing annual royalty of $22,500 and owned rights in several other patents. . . . Pixel's liabilities to petitioners under the terms of the promissory note comprised substantially all of Pixel's liabilities in 2008.

(Formatting omitted.) Those findings are not clearly erroneous.

In short, Pixel had a steady, if small, income stream, and it had hundreds of thousands of dollars worth of assets. Petitioners almost certainly could not have recovered the full $2 million and change but, considering that they were essentially the only creditors, they likely could have made a partial recovery. The Tax Court permissibly concluded that the debt had not become "totally worthless." 26 C.F.R. § 1.166-5(a)(2).

C.  *Accuracy Penalties*

Title 26 U.S.C. § 6662(a) imposes a 20 percent penalty to underpayments of tax if any of the conditions in § 6662(b) is met.  Here, the Tax Court found that two conditions were met:  "Negligence or disregard of rules or regulations," *id.* § 6662(b)(1), and "[a]ny substantial understatement of income tax," *id.* § 6662(b)(2).  On appeal, Petitioners do not challenge those findings.

Section 6664(c) provides a "[r]easonable cause exception for underpayments":  "No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  26 U.S.C. § 6664(c)(1).  Petitioners assert that they relied in good faith on professional advice.

> Reliance on professional advice may establish reasonable cause and good faith.  Treas. Reg. § 1.6664-4(b)(1).  The Tax Court requires a taxpayer to prove three elements in order to show that reliance on advice was reasonable:  "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 99 (2000).  Once the Commissioner produces evidence showing that an accuracy-related penalty applies, the

burden of proving the existence of reasonable cause and good faith falls on the taxpayer.

*DJB Holding Corp. v. Comm'r*, 803 F.3d 1014, 1029–30 (9th Cir. 2015). Here, the Tax Court held that Petitioners failed to meet their burden of showing that they actually relied in good faith on an adviser's judgment. "Whether the taxpayer acted with reasonable cause and in good faith is a finding of fact reviewed for clear error." *Id.* at 1022.

### 1. *Royalty Penalty*

With respect to the royalty penalty, Petitioners contended that they relied on the advice of Baker. The Tax Court found:

> Mr. Baker testified with respect to the royalty payments and petitioners' compliance with section 1235 that he advised petitioners that Mr. Cooper could not indirectly control TLC. Moreover, Mr. Baker did not provide advice to petitioners before they filed their Forms 1040 for the years at issue, nor did he provide advice to petitioners regarding whether Mr. Cooper controlled TLC following TLC's incorporation. Petitioners did not follow Mr. Baker's advice to ensure that Mr. Cooper did not indirectly control TLC. Consequently, petitioners cannot claim reliance on the professional advice of Mr. Baker to negate the section 6662(a) penalty with respect to their erroneous capital gain treatment of the royalty payments Mr. Cooper received during the years at issue.

Those findings are not clearly erroneous, and the Tax Court's reasoning is sound. Baker advised Petitioners *at the time they formed TLC* that, in order to receive capital gains treatment, Mr. Cooper could not control TLC indirectly. Baker also testified specifically that he had no recollection that he ever advised Petitioners that the way in which they were operating TLC actually conformed to his advice. Indeed, there is no evidence that Petitioners ever sought post-formation advice from anyone about whether their conduct actually complied with Baker's advice.

Nor was the penalty inappropriate because of the allegedly uncertain state of the law. "[A]n honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances" can excuse an understatement of tax. 26 C.F.R. § 1.6664-4(b)(1). But there is patently no honest misunderstanding here: Petitioners' theory at trial was that Baker advised them to conform with *Charlson* such that they did not informally control TLC. Indeed, they conceded before the Tax Court that *Charlson* provided the binding legal rule: Capital gains treatment is unavailable if the taxpayer informally controls the corporation. It is only on appeal that they have challenged the legal standard. Accordingly, whatever merit Petitioners' argument might have had if they truly had been uncertain about the validity of *Charlson* (despite the fact that no court has questioned its validity), Petitioners cannot benefit from that purported uncertainty because it was not until this appeal that they alleged any uncertainty.

2. *Bad Debt Penalty*

With respect to the bad debt penalty, Petitioners contended that they relied on the advice of Mitch Mitchell and Baker. The Tax Court found:

> With regard to the bad debt deduction, petitioners have failed to introduce evidence regarding what information they provided to Mr. Baker and Mr. Mitchell to enable them to determine whether the promissory note was worthless within the meaning of section 166 in 2008. Petitioners did not call Mr. Mitchell to testify or otherwise introduce any evidence regarding Mr. Mitchell's advice. Similarly, Mr. Baker did not testify regarding any advice he may have given to petitioners that would indicate that it was his opinion that the promissory note became worthless in 2008. In short, petitioners have failed to prove that they received or relied on the professional advice of Mr. Baker and Mr. Mitchell with respect to their erroneous section 166 bad debt deduction in 2008.

Again, there is no clear error. Petitioners have not rebutted the Tax Court's finding that Petitioners failed to prove that "the taxpayer provided necessary and accurate information to the adviser." *DJB Holding Corp.*, 803 F.3d at 1030. Mitchell did not testify, and neither Petitioners nor the Commissioner asked Baker any questions about the bad debt

or about any advice he may have given Petitioners on that topic.

**AFFIRMED.**

KLEINFELD, Senior Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent. My dissent is directed only to Section A, "Royalty Payments as Capital Gains." I join in Section B, "Bad Debt Deduction." As for Section C, "Accuracy Penalties," whether and how the penalties would apply would need to be revisited if my view on royalties were to be accepted.

The majority errs because it dilutes the meaning of "control" from the ability to compel a result to something less and indeterminate. This puts us at odds with our only sister circuit to rule on the matter, the Court of Claims in *Charlson v. United States*.[1] Both *Charlson* and the Commissioner's own regulations show the error of the majority's approach.

The majority opinion accurately notes that in *Charlson*, the corporation to which inventor Lynn Charlson transferred his patent was owned by his "close friends and associates." Actually, they were more than close friends and associates: three of the shareholders and directors were his employees,

---

[1] 525 F.2d 1046 (Ct. Cl. 1975) (per curiam); *cf. S. Corp. v. United States*, 690 F.2d 1368, 1370–71 (Fed. Cir. 1982) (en banc) (adopting Court of Claims opinions as binding precedent).

and the fourth was his personal attorney.[2]  As such, Charlson could fire each of them if he disliked how they voted.  The corporation also "frequently sought, received, and followed the recommendations of Charlson,"[3] and Charlson and the directors were "solicitous of each other's individual interests as well as their mutual interests."[4]  The Commissioner argued that the corporation, the directors of which had their livelihoods subject to Charlson's preferences, followed his recommendations, and were solicitous of his personal interests, was "controlled" by Charlson.[5]  And Charlson certainly had more ability to influence than Cooper does.  Cooper cannot fire his sister-in-law and her friend from their jobs.

Yet Charlson won his case.  The Commissioner lost.[6] Despite the evidence that the corporation did what Charlson wanted, the Court of Claims concluded that he did not "control" the corporation such that the transfer of patent rights was not genuine.  Today's majority opinion quotes *Charlson*'s statement that the "retention of control by a holder of an unrelated corporation can defeat capital gains treatment, if the retention prevents the transfer of all substantial rights."[7]  That language marks the boundary of

---

[2] *Charlson*, 525 F.2d at 1048–49.

[3] *Id.* at 1056.

[4] *Id.* at 1055.

[5] *Id.* at 1052.

[6] *Id.* at 1057.

[7] *Id.* at 1053 (internal quotation marks omitted).

capital gains treatment, but *Charlson* held that the boundary was not crossed.  Charlson had power over the corporate directors—far more power than Cooper had over TLC's directors—but Charlson did not "control" the directors for the purposes of § 1235.

The regulations make it clear that even though the directors in this case are Cooper's friends and relatives, that does not amount to control or make TLC a "related" entity. The regulations are at pains to say that even transferring patent rights to a corporation controlled by one's own brother "is not considered as transferring such rights to a related person."[8]  Since a brother is not a "related person" for § 1235(c) purposes, neither is a sister-in-law or a friend of a sister-in-law.

The majority correctly concedes that "[m]ere influence by the patent holder is insufficient to defeat § 1235(a) treatment."  But influence is all Cooper had.  His authority over Walters (his sister-in-law) and Coulter (a friend of Walters and of Cooper's wife) was considerably less than Charlson's authority over his employees.  Cooper's situation is more like the one in *Lee v. United States*, where the transfer put the taxpayer's own longtime personal friend in charge.[9] Yet in *Lee*, as in *Charlson*, the Commissioner lost.  *Lee* held that the issue of control is whether the taxpayer can "force" the transferee to do his bidding.[10]  There is no evidence whatsoever that Cooper had that power.

---

[8] 26 C.F.R. § 1.1235-2(f)(3); *see* 26 U.S.C. § 1235(c)(2).

[9] 302 F. Supp. 945, 948 (E.D. Wis. 1969).

[10] *Id.* at 950.

Walters and Coulter, like the directors in *Charlson*, were solicitous of Cooper's and each other's personal interests. They did transfer a few patents to Cooper for no consideration so that he could in turn transfer them to a corporation in which his children had an interest. But Walters and Coulter still owned 76% of the new corporation. (Instead of Cooper and his wife owning 24%, Cooper and his wife owned 1% and their children owned 23%.) And Cooper was not the only one who benefitted from TLC. Walters and Coulter each received $40,000 in director's fees, and TLC bought them long-term insurance policies worth $115,406 and $63,089, respectively. Cooper did not receive an insurance policy.

Although the Commissioner argues that the patent transfer benefitting Cooper's children somehow breached a fiduciary duty to TLC's shareholders, that argument would apply equally to the payments made to Walters and Coulter. And it would be equally irrelevant. All that a breach of fiduciary duty means is that Walters and Coulter, acting in their capacity as shareholders, could theoretically sue themselves in their capacity as directors. That unlikely possibility does not show control. The core of the Commissioner's argument—that the directors knew nothing about Cooper's sophisticated inventions and simply followed his instructions—does not show control. If anything, it shows that there was no good reason for them to reject Cooper's recommendations, because it was his knowledge and skill that generated millions in revenue, so he did not need control.

In distinguishing control from influence, our focus should not be merely on whether TLC's directors did what Cooper wanted. There was no reason for them to do anything else. Instead we must ask whether, as a practical matter, they could

have done otherwise. Cooper could have, but did not, set up the corporation to retain control.

The most obvious way to control a corporation is to own a majority of its stock. For example, owning 100% of the stock defeated the tax benefits in the classic sham case *Gregory v. Helvering*.[11] However, Congress provided that a patent holder cannot receive capital gains treatment if he owns 25% or more of the corporation to which he transferred his patents.[12] That is why Cooper and his wife owned only 24% of TLC's stock.

Minority shareholders may still control a corporation by controlling its directors' votes, and there are well-established means by which Cooper might have done so. Those means are often used in close corporations to protect minority shareholders from oppression. One way to retain control is to write the articles of incorporation to require a super-majority so that no decision can be made without the minority shareholders' consent.[13] Another is to establish a voting trust so that the majority must vote their shares in line with the minority's preferences.[14] A third means is to use classified shares with the minority shares controlling the class that chooses the directors.[15] And a fourth is to contractually obligate the directors to vote consistently with the minority

---

[11] 293 U.S. 465, 467–69 (1935).

[12] 26 U.S.C. § 1235(c)(1); *see id.* § 267(b)(2).

[13] ROBERT C. CLARK, CORPORATE LAW 775 (1986).

[14] *Id.* at 777.

[15] *Id.* at 780.

shareholders' preferences.[16]  This list is not exhaustive, of course.  But Cooper did not do any of these things.  If he had, then he would have genuinely controlled TLC, not just influenced it.

Because Cooper's inventions generated TLC's revenue, Walters and Coulter no doubt thought it was in TLC's best interest to accommodate Cooper and keep him productive.  But Cooper could not always count on Walters and Coulter to do things his way.  At some point, he would age out of his peak productivity, meaning there would be less reason to listen to him.  Moreover, a change in circumstances could always occur.  As Professor Clark wrote in his treatise:

> As time passes, the personal relationships among the major participants in a close corporation always change in important ways. One of several participants will retire or die, leaving a gap in a shareholding or managerial role that might or might not be filled. Participants who were once friendly to each other will accumulate grudges.  Some participants will want to go on to other ventures.  Others will want to bring in new associates, who may or may not be acceptable to the others.[17]

If, for example, a buyout offer could enrich Walters and Coulter but would end Cooper's influence over TLC, that might create conflict between the shareholders.  Yet Cooper

---

[16] *Id.* at 781–83.

[17] *Id.* at 763.

would lack any power to make Walters and Coulter reject the buyout. They would be multimillionaires and he would lose his connection to his own inventions.

Because the majority opinion makes "control" a vague and ambiguous term, it risks eviscerating § 1235 capital gains treatment when transfers are made to close corporations. Congress thought it was a good idea to give patent holders a tax benefit, but the majority's decision creates so much risk of litigation that it may be a bad idea to claim the benefit. A transfer to a corporation directed by the inventor's employees and attorney was good enough in *Charlson*.[18] A transfer to a corporation directed by one's longtime friend was good enough in *Lee*.[19] And a transfer to a corporation controlled by one's own brother is good enough under the regulations.[20] Yet now a transfer to a corporation controlled by one's sister-in-law and her friend is *not* good enough, even if the taxpayer lacks any means to compel those directors to do his will. Accordingly, it is not possible to say with confidence what close corporation arrangement will qualify for capital gains treatment.

In short, the majority opinion does not say how "control" is distinct from "mere influence," so mere influence of some vague and indeterminate kind prevents capital gains treatment. "Control" means the taxpayer can make the transferee corporation do what he wants, while "influence" means that although the corporation may defer to his

---

[18] 525 F.2d at 1048–49, 1057.

[19] 302 F. Supp. at 948, 950.

[20] 26 C.F.R. § 1.1235-2(f)(3).

judgment or be persuaded by his view, he cannot make the corporation do what he wants.  The better approach is the one seen in *Charlson* and *Lee*: that "control" means the ability to compel what the transferee corporation does.