# United States Tax Court

T.C. Memo. 2023-142

LUMINITA ROMAN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

GABRIEL L. ROMAN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 10878-16, 7671-17.            Filed November 28, 2023.

————

Luminita Roman, pro se in Docket No. 10878-16.

Gabriel L. Roman, pro se in Docket No. 7671-17.

*Andrea M. Faldermeyer*, *Christine A. Fukushima*, and *Alexander D. DeVitis*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

TORO, *Judge*: In these consolidated cases, petitioners, Luminita Roman and Gabriel L. Roman (collectively, the Romans), challenge the Commissioner of Internal Revenue's determinations that they had

[*2] deficiencies in income tax for their 2013 taxable years. After concessions made by the parties,[1] five issues remain for our decision.

First, we must decide whether a payment of $700,000 made in 2013 pursuant to a settlement agreement to which both Mr. Roman and Ms. Roman were parties is excludable from the Romans' gross income under section 104(a)(2).[2] The Romans argue that the settlement proceeds were paid on account of personal physical injuries or physical sickness. The Commissioner disagrees. As we will explain below, we agree with the Commissioner.

Second, given our conclusion on the first issue, we must also decide whether the $700,000 payment made under the agreement should be allocated to both Mr. Roman and Ms. Roman, even though it was paid only to Ms. Roman. As we discuss below, we find that the income should be allocated 50/50 between the Romans.

Third, given our conclusions on the first two issues, we must decide whether Ms. Roman should be treated as having earned an additional $350,000 for services rendered to Mr. Roman. On this issue, we conclude that no additional income should be attributed to Ms. Roman.

Fourth, we must determine whether Ms. Roman is liable for an accuracy-related penalty under section 6662 for an underpayment attributable to a substantial understatement of income tax for the 2013 taxable year. On this point, we find for the Commissioner.

Finally, we must determine whether Mr. Roman is liable for a failure to timely file addition to tax under section 6651(a)(1) for the 2013 taxable year. On this point, we find for the Commissioner.

---

[1] Ms. Roman has conceded that she is liable for tax on $34 in unreported interest income for her 2013 taxable year, and the Commissioner has conceded that Ms. Roman can exclude $9,994 in wages previously reported on her taxable year 2013 return.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]                           FINDINGS OF FACT

The parties have filed a First Stipulation of Facts, amended twice, and Second, Third, and Fourth Stipulations of Facts, all with attached Exhibits. We incorporate the parties' Stipulations of Facts and the attached Exhibits by this reference. We held a consolidated trial of these cases at the Court's Los Angeles, California, Special Trial Session, on April 24, 2023. The Romans each resided in California when they timely filed their respective Petitions to commence these cases.

## I.    *The Romans*

Mr. Roman is an individual deemed by the Social Security Administration to be permanently disabled and has been diagnosed with various conditions, including, among others, major depression, paranoia, and prostate cancer. Mr. Roman also underwent spine surgery in July 2010. Mr. Roman receives benefits under Medi-Cal, the State of California's Medicaid program.

Mr. Roman and Ms. Roman were married until 2004. After their marriage ended, the Romans continued living together, with Ms. Roman serving as Mr. Roman's live-in-care provider under California's In-Home Supportive Services program. Ms. Roman received compensation from the State of California's Department of Social Services for providing care to Mr. Roman.

Mr. Roman also receives government low-income rental housing assistance. During the period relevant here, Ms. Roman was authorized to reside with Mr. Roman under the rental assistance program.

## II.    *The Jefferson at Hollywood Apartments*

The Jefferson at Hollywood Apartments (Apartments) is an apartment complex in Los Angeles, California. Mr. Roman executed a lease agreement to move into the Apartments on October 5, 2010. Mr. Roman also executed a Caregiver Addendum and Affidavit along with the lease, which allowed Ms. Roman to reside in the apartment with him as his "live-in caregiver." The Romans moved into the Apartments after Mr. Roman signed the lease. At that time, the Apartments was owned by Jefferson at Hollywood, LP (Jefferson), and managed by Greystar Real Estate Partners, LLC (Greystar).

Shortly after moving to the Apartments, the Romans began making various complaints to Jefferson and Greystar about the

**[*4]** property, including expressing concerns about noise and harassment and submitting requests for accommodations in connection with Mr. Roman's disabilities. Various legal actions ensued.

III. *Legal Actions Among the Romans, Jefferson, and Greystar*

    A. *Federal Lawsuit*

Mr. Roman filed the first lawsuit against Jefferson and Greystar in the U.S. District Court for the Central District of California on April 22, 2011. Mr. Roman sought "injunctive relief and damages" from Jefferson and Greystar "for discrimination, harassment, intimidation and retaliation, in the rental of housing based on [his] disability." The complaint asserted:

> This action arises under the Federal Fair Housing Amendments Act of 1988, the California Fair Employment and Housing Act, the California Unruh Civil Rights Act, the California Disabled Person Act, the California Unfair Business Practice Act, the FIRST AMENDMENT to the US Constitution and also alleges negligence, slander and libel, invasion of privacy, constructive eviction, breach of implied covenant of quiet enjoyment, nuisance and intentional infliction of emotional distress.

The District Court dismissed Mr. Roman's complaint in its entirety in July 2011. Specifically, the District Court dismissed his federal law claims for failure to state a claim upon which relief can be granted and declined to exercise supplemental jurisdiction over his state law claims. Mr. Roman appealed this ruling to the U.S. Court of Appeals for the Ninth Circuit. The Ninth Circuit affirmed the District Court's decision in October 2012, and the U.S. Supreme Court denied certiorari in May 2013.

    B. *State Privacy Lawsuit*

The next lawsuit against Jefferson and Greystar was filed by Ms. Roman in Los Angeles Superior Court on January 18, 2012. It alleged violations of various provisions of the California Penal Code relating to intercepted communications, negligence, and violations of a common law right of privacy. In the complaint, Ms. Roman asserted that Jefferson and Greystar "installed and/or caused to be installed certain wire-tapping, eavesdropping and bugging equipment in its employees' or agents' telephone lines" and that her calls to Jefferson and

[*5] Greystar "were recorded monitored and/or eavesdropped upon without [her] knowledge or consent." Ms. Roman subsequently amended the complaint to allege only violations of a single provision of the California Penal Code, § 632.7 (West 2012).

On May 23, 2012, the Superior Court sustained Jefferson's and Greystar's demurrer to Ms. Roman's amended complaint without granting her leave to amend her complaint. Ms. Roman appealed the ruling to sustain the demurrer to the Court of Appeal for the State of California. However, because such an order did not grant appeal rights, the Court of Appeal ordered Jefferson and Greystar to obtain a dismissal order for the lawsuit from the Superior Court and supply it to the Court of Appeal. The Superior Court subsequently dismissed the case on July 10, 2013. Ms. Roman appealed the Superior Court's dismissal.

### C.     *Unlawful Detainer Action*

The next legal move came from Jefferson, which on October 3, 2012, filed an unlawful detainer action against Mr. Roman in Los Angeles Superior Court. The unlawful detainer action was based upon a 60-day notice to terminate Mr. Roman's tenancy at the Apartments. The Superior Court dismissed the case against Mr. Roman in January 2013. Jefferson appealed the Superior Court's dismissal of the unlawful detainer, and Mr. Roman filed a cross-appeal as to the Superior Court's award of attorney's fees, which Mr. Roman claimed were inadequate.

### D.     *California Fair Housing Complaint*

The Romans also filed a discrimination complaint against Jefferson with the California Department of Fair Employment and Housing (DFEH) on November 23, 2012. The Romans alleged in their complaint that the 60-day notice to terminate residency and the related unlawful detainer action (discussed above) were intended to retaliate against them for their claims of discrimination regarding Mr. Roman's disabilities. In its response, Jefferson denied the Romans' allegations of discrimination and alleged that the 60-day notice to terminate residency was based on lease violations concerning noise and the Romans' conduct.

## IV.     *Sale of the Apartments to BRE Properties*

While the various legal actions described above were pending, Jefferson sought to sell the Apartments. In the first quarter of 2013, Jefferson retained the firm Cushman & Wakefield to help find a buyer

[*6] for the property and negotiate its sale. In June 2013, BRE Properties (BRE) was selected as the buyer for the Apartments. At the time, BRE was engaged in litigation with the Romans, in which the Romans alleged that BRE discriminated against them on account of Mr. Roman's disabilities when they attempted to rent a unit at one of BRE's other properties in 2009.[3]

BRE discovered that the Romans lived in the Apartments before closing on the purchase of the Apartments. After making this discovery, BRE insisted that Jefferson either reduce the price of the property or ensure that, before the sale, the Romans vacate the property and release any claims against the property. At one point, BRE indicated that it would reduce its offer to purchase the property by $1 million if the Romans remained at the Apartments. At another point, BRE was ready to walk away altogether if the Romans did not leave the building.

Eventually, in July 2013, Jefferson and BRE executed a Purchase and Sale Agreement to memorialize the sale of Apartments to BRE. Included in the Purchase and Sale Agreement are provisions related to the Romans. One reads as follows:

> Seller [Jefferson] shall have confirmed to Buyer's reasonable satisfaction that Gabriel and Luminita Roman are no longer tenants at the Property and that they have vacated Unit 424 at the Property, and that Seller has settled the outstanding litigation with the Romans relating to the Property.

The Purchase and Sale Agreement contains other provisions under which Jefferson represents to BRE that "[a]ny and all litigation relating to the Property between Seller and [the Romans] has been settled and dismissed with prejudice," "[a]ny and all Leases between Seller and Luminita and/or Gabriel have been terminated," and "Luminita has released any right to reside at the Property."

To address BRE's concerns, Jefferson, through Cushman & Wakefield, engaged with Ms. Roman about an agreement that would resolve all pending and future legal claims between them and require

---

[3] For additional background about this lawsuit and another one filed by the Romans against BRE's survivor, BEX Portfolio, LLC, see the 2015 and 2019 decisions by the Court of Appeal of the State of California, Second Appellate District, Division Seven. *Roman v. BRE Props., Inc.*, 188 Cal. Rptr. 3d 537 (Ct. App. 2015); *Roman v. BRE Props.*, Inc., B282422, 2019 WL 5956392, at *1 (Cal. Ct. App. Nov. 13, 2019).

[*7] the Romans to vacate the property.  Mr. Roman was not physically present during these settlement negotiations, nor did he have any communication with Jefferson concerning the settlement, aside from eventually executing the agreement the parties reached.

V.    *Settlement Agreement Among the Romans, Jefferson, and Greystar*

In September 2013, Jefferson made the Romans an offer to pay $700,000 in exchange for their vacating the Apartments and executing a mutual release of any pending and future legal claims.  Marc Renard, who negotiated the settlement with Ms. Roman on behalf of Jefferson, gave the Romans 15 minutes to accept the offer and told Ms. Roman that for every 15 minutes in which they did not accept (after the initial 15 minutes), the offer would go down by $50,000.  Ms. Roman then conveyed the offer to Mr. Roman and told him she would leave him if he did not agree.  Within the first 15 minutes set by Mr. Renard, the Romans accepted the offer.

The agreement was reduced to writing in the form of a Settlement and Mutual Release Agreement (Settlement Agreement).  The Romans, Jefferson, and Greystar executed the Settlement Agreement on September 19, 2013.  The Settlement Agreement refers to both Mr. Roman and Ms. Roman as the "Tenants," Jefferson and Greystar as the "Landlords," the Apartments as the "Community," and Mr. Roman's apartment as the "Premises."  BRE was not a party to the Settlement Agreement.

In relevant part, the terms of the Settlement Agreement are as follows:[4]

3.    Consideration

3.1    Tenants shall totally and completely vacate the Premises and the Community in good condition on or before September 26, 2013 at 5:00 PM pacific standard time, by removing all personal property from the Premises and all vehicles from the Community and by turning in all keys to the Premises and/or to the Community to

---

[4] The provisions are numbered in the manner in which they appear in the copy of the Settlement Agreement in the record.

[*8]  Landlords at the management office located at the Community.

3.2   Upon Tenants timely vacating the Premises by on or before September 26, 2013 at 5:00 PM pacific standard time, Landlord shall pay to Luminita [Roman] the sum of Seven hundred thousand dollars . . . ($700,000.00) by cashier's check or other certified funds.

3.3   Upon execution of this Agreement by all Parties, Landlords shall cause the appeal in the [unlawful detainer action] to be dismissed with prejudice; [Mr. Roman] shall cause the cross-appeal in the [unlawful detainer action] to be dismissed with prejudice; [Ms. Roman] shall cause the appeal in the Privacy Lawsuit to be dismissed with prejudice; and [Mr. Roman] shall cause the DFEH Complaint to be dismissed with prejudice.

. . . .

3.6   The Parties agree to execute a joint letter to the Housing Authority of the City of Los Angeles stating that Tenants' lease is terminated by mutual agreement effective September 26, 2013 at 5:00 PM pacific standard time, and that Landlord waives Tenants' obligation to provide a thirty (30) day notice to terminate tenancy which may otherwise be required by law.

3.5   Tenants acknowledge that timely vacating the Premises within the time called for in paragraph 3.1 is a material term of this Agreement, without which Landlords would not enter into this Agreement. Therefore, in the event Tenants execute this Agreement but they, or either one of them, fails to perform their obligations under paragraph 3.1 in full within the time set forth therein, Tenants agree that paragraph 3.2 shall be null and void and that [Ms. Roman] will not be entitled to receive the payment set forth in paragraph 3.2, but the other provisions of this Agreement, including the provisions relating to dismissal set forth in paragraph 3.3 and the mutual releases set forth in paragraph 4, shall be fully enforceable without limitation.

**[*9]** The Settlement Agreement includes a general "Mutual Release" paragraph in which the Romans, Jefferson, and Greystar agreed to release each other

> from all liability, claims, demands, actions, causes of action, damages (whether general, special, personal, property, contractual, exemplary, punitive, or otherwise), liens, costs, expenses, fees, compensations, controversies, judgments, and rights of whatever kind and nature related in any way to the transactions or occurrences between them to date . . . .

The Mutual Release paragraph also includes the following:

> This release is intended to be interpreted as broadly as possible, to apply to all transactions and occurrences between the Parties, including, but not limited to, any and all claims related to transactions or occurrences concerning Tenants' tenancy at the Premises and/or the Community, the Privacy Lawsuit (and appeal thereof), the [unlawful detainer] (and appeal and cross-appeal thereof), the DFEH Complaint, as well as all other losses, liabilities, claims, charges, demands and causes of action, known or unknown, suspected or unsuspected, arising directly or indirectly out of or in any way connected to these transactions or occurrences (collectively "Released Claims").

The Settlement Agreement does not mention any claims of physical injuries or sickness suffered by the Romans.

The Settlement Agreement contains a paragraph titled "No Admission of Fault or Liability." This provision reads as follows:

> Neither the execution and delivery of this Agreement, nor compliance with its terms, shall constitute an admission of any fault or liability on the part of any of the Parties, or any of their respective agents, attorneys, representatives, or employees. None of the Parties to this Agreement admit fault or liability of any sort and, in fact, all Parties expressly deny fault and liability.

The Settlement Agreement also contains an integration clause, which reads as follows:

[*10]     12.11 Entire Agreement.   This Agreement constitutes the entire agreement and understanding between the Parties on the matters and issues addressed hereunder and it supersedes and replaces any prior negotiations, oral or written agreements on the same subject matter between the Parties hereto.   No parol evidence may be admitted in any proceeding between the Parties hereto to vary the terms or provisions of this Agreement.

Pursuant to the Settlement Agreement, the Romans moved out of the Apartments on September 26, 2013, and they caused the various ongoing actions addressed in section 3.3 of the Settlement Agreement to be dismissed.  Ms. Roman received a $700,000 payment from Jefferson later in 2013.  Mr. Roman was not directly paid any portion of the settlement proceeds, nor did he receive directly any proceeds as a result of his legal claims against Jefferson and Greystar.

Jefferson issued a Form 1099–MISC, Miscellaneous Income, to Ms. Roman, reporting the $700,000 settlement proceeds as "Other Income" for 2013.  Jefferson did not issue a Form 1099–MISC to Mr. Roman for 2013.

VI.   *The Romans' 2013 Tax Returns*

A.   *Ms. Roman's Return*

Ms. Roman timely filed Form 1040, U.S. Individual Income Tax Return, for the 2013 taxable year.  She prepared her own return. Ms. Roman reported total income of $15,530 for 2013, consisting of wages of $9,994, taxable interest of $5,517, and capital gain of $19. Although Ms. Roman received the Form 1099–MISC Jefferson issued to her, she did not report any portion of the settlement proceeds in her return nor on any return for other taxable years.  She further claimed on line 36 a $20,000 deduction for unlawful discrimination claim costs, reflecting a payment out of the $700,000 settlement proceeds to the attorney who represented the Romans in the litigation against Jefferson and Greystar.

B.   *Mr. Roman's Return*

Mr. Roman did not file a timely income tax return for 2013.  On October 26, 2015, Mr. Roman filed Form 1040EZ, Income Tax Return for Single and Joint Filers With No Dependents, for 2013.  Mr. Roman

**[*11]** prepared his own return. Mr. Roman did not report any income or claim any loss, deduction, credit, or other tax items on his return.

VII. *Notices of Deficiency and Tax Court Proceedings*

A. *Ms. Roman*

The Commissioner's Automated Underreporter Unit (AUR), a document matching program, issued to Ms. Roman a CP2501 Notice on September 14, 2015, and a Notice CP2000 on November 23, 2015. Ms. Roman did not respond to either notice. Then on February 16, 2016, the Commissioner's AUR program generated a Notice of Deficiency and issued it to Ms. Roman.

In the Notice of Deficiency, the Commissioner determined, in relevant part, that Ms. Roman failed to report on her tax return the $700,000 payment that she received from Jefferson during the 2013 taxable year. In addition, the Commissioner determined that Ms. Roman was liable for a deficiency in income tax of $230,792 and an accuracy-related penalty of $46,158 under section 6662 for an underpayment attributable to a substantial understatement of income tax. The substantial understatement of income tax penalty was automatically calculated through electronic means by the Commissioner's AUR program.

Ms. Roman timely filed her Petition with our Court on May 9, 2016, to commence her case.

B. *Mr. Roman*

The Commissioner issued Mr. Roman a Notice of Deficiency for the 2013 taxable year on March 15, 2017. In the Notice of Deficiency, the Commissioner determined that Mr. Roman earned $350,000 of the proceeds from the Settlement Agreement and adjusted his income accordingly. As a result of this adjustment, the Commissioner determined an income tax deficiency of $97,360 and a section 6651(a)(1) addition to tax for failure to timely file a return of $24,340.

Mr. Roman timely filed his Petition with our Court on April 5, 2017, to commence his case.

**[*12]**                                        OPINION

I.     *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous.  *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Merkel v. Commissioner*, 192 F.3d 844, 852 (9th Cir. 1999), *aff'g* 109 T.C. 463 (1997).  In cases involving unreported income in the Ninth Circuit, to which an appeal in these cases would ordinarily lie, *see* I.R.C. § 7482(b)(1)(A), this general rule is subject to the following conditions:

> For the presumption to apply . . . the Commissioner must base the deficiency on some substantive evidence that the taxpayer received unreported income.  If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer to show by a preponderance of the evidence that the deficiency was arbitrary or erroneous.  If the [taxpayer] succeeds in showing that the deficiency was arbitrary or erroneous, the burden shifts back to the Commissioner to show that the [determination] was correct.

*Hardy v. Commissioner*, 181 F.3d 1002, 1004–05 (9th Cir. 1999) (citations omitted), *aff'g* T.C. Memo. 1997-97; *see also Walquist v. Commissioner*, 152 T.C. 61, 67 (2019); *Caldwell v. Commissioner*, T.C. Memo. 2022-51, at *5 ("In cases of unreported income, the Commissioner must establish an evidentiary foundation connecting the taxpayer to the income-producing activity, *Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977), or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982).").

In these cases, there is no dispute that Ms. Roman received $700,000 pursuant to the terms of the Settlement Agreement.  That fact, together with the terms of the Settlement Agreement, establishes the requisite evidentiary foundation connecting both Ms. Roman and Mr. Roman to the income.  Accordingly, Ms. Roman and Mr. Roman have the burden of proof to show that the deficiencies determined against them are erroneous.  We note, however, that because we resolve these cases on the preponderance of the evidence (as we describe further below), allocation of the burden of proof does not affect our conclusions.

**[\*13]** II.    *Taxation of Settlement Proceeds*

    A.    *General Legal Principles*

Gross income includes "all income from whatever source derived." I.R.C. § 61(a); *see also Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429 (1955); *Rivera v. Baker West, Inc.*, 430 F.3d 1253, 1256 (9th Cir. 2005). Settlement proceeds constitute gross income unless the taxpayer proves that they fall within a specific statutory exception. *See Commissioner v. Schleier*, 515 U.S. 323, 328 (1995); *see also Simpson v. Commissioner*, 141 T.C. 331, 338–39 (2013) ("It is well established that statutory exclusions . . . are to be narrowly construed and that taxpayers generally bear the burden of proving that they fall squarely within the requirements for any exclusion from gross income." (Citations omitted.)), *aff'd*, 668 F. App'x 241 (9th Cir. 2016).

Section 104(a)(2) excludes from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness." For purposes of section 104(a)(2), "emotional distress shall not be treated as a physical injury or physical sickness." I.R.C. § 104(a) (flush text);[5] *see also Rivera*, 430 F.3d at 1256; *Doyle v. Commissioner*, T.C. Memo. 2019-8, at \*12. For settlement proceeds to fall within this statutory exclusion, there must be "'a direct causal link' between the [proceeds] and the personal injuries sustained." *Rivera*, 430 F.3d at 1257 (quoting *Banaitis v. Commissioner*, 340 F.3d 1074, 1080 (9th Cir. 2003), *rev'd and remanded sub nom. Commissioner v. Banks*, 543 U.S. 426 (2005)). The nature of the claim that was the basis for the settlement controls whether the damages are excludable under section 104(a)(2). *See United States v. Burke*, 504 U.S. 229, 237 (1992); *Simpson*, 141 T.C. at 339–40 ("Whether a settlement is achieved through a judgment or by a compromise agreement, the question to be asked is: 'In lieu of what were the damages awarded?'" (quoting *Fono v. Commissioner*, 79 T.C. 680, 692 (1982), *aff'd without published opinion*, 749 F.2d 37 (9th Cir. 1984))); *see also Milenbach v. Commissioner*, 318 F.3d 924, 932 (9th Cir. 2003) ("The nature of a settlement payment is a question of fact reviewed for clear error. When a claim is resolved by settlement, the relevant question for

---

[5] The flush text of section 104(a) provides that the general rule against exclusion of emotional-distress damages does not apply to "the amount paid for medical care" attributable to emotional distress. The Romans do not raise this issue, and we do not consider it further.

**[\*14]** determining the tax treatment of a settlement award is: 'In lieu of what were the damages awarded?'" (Citations omitted.)), *aff'g in part, rev'g in part, and remanding* 106 T.C. 184 (1996).

To determine the basis of a settlement, we look first to the terms of the settlement agreement to determine whether any of the proceeds were paid on account of personal physical injury or physical sickness. *See Rivera*, 430 F.3d at 1257 (explaining that courts look to "the underlying agreement to determine whether it expressly states that the damages compensate for 'personal physical injuries or physical sickness' under § 104(a)(2)"); *Simpson*, 141 T.C. at 340 (same). If the agreement "lacks express language specifying the purpose of the compensation, we will then examine the intent of the payor" to determine the basis for the settlement. *Rivera*, 430 F.3d at 1257; *see also Simpson*, 141 T.C. at 340. In determining the intent of the payor, we consider all facts and circumstances surrounding the settlement, including the complaints that were filed and the details surrounding the legal actions. *See Rivera*, 430 F.3d at 1257 (citing *Allum v. Commissioner*, T.C. Memo. 2005-177); *see also Simpson*, 141 T.C. at 340–41; *Bent v. Commissioner*, 87 T.C. 236, 245 (1986), *aff'd*, 835 F.2d 67 (3d Cir. 1987); *Sharp v. Commissioner*, T.C. Memo. 2013-290, at \*7–8. "Ultimately, the character of the payment hinges on the payor's dominant reason for making the payment." *Tillman-Kelly v. Commissioner*, T.C. Memo. 2022-111, at \*6 (quoting *Green v. Commissioner*, 507 F.3d 857, 868 (5th Cir. 2007), *aff'g* T.C. Memo. 2005-250). "[T]he nature of underlying claims cannot be determined from a general release [of claims] that is broad and inclusive." *Id.* (quoting *Ahmed v. Commissioner*, T.C. Memo. 2011-295, 2011 WL 6440130, at \*3, *aff'd per curiam*, 498 F. App'x 919 (11th Cir. 2012)). "[A]ll settlement proceeds are included in gross income where there is a general release but no allocation of settlement proceeds among various claims." *Doyle*, T.C. Memo. 2019-8, at \*15 (quoting *Molina v. Commissioner*, T.C. Memo. 2013-226, at \*12). Moreover, we have found general, prospective waivers inadequate to show that a settlement payment was made for a physical injury. *Smith v. Commissioner*, T.C. Memo. 2018-127, at \*18 n.5 (citing *Devine v. Commissioner*, T.C. Memo. 2017-111, 113 T.C.M. (CCH) 1496, 1499), *aff'd*, No. 19-1050, 2020 WL 8368279 (D.C. Cir. Dec. 22, 2020).

B.     *Application to Proceeds from Settlement Agreement*

After a thorough review of the record of these cases, we easily conclude that the $700,000 payment was not made "on account of personal physical injuries or physical sickness." *See* I.R.C. § 104(a)(2).

**[*15]** We start with the express terms of the Settlement Agreement, which contain no indication that the payment was for personal physical injury or physical sickness. Indeed, the Settlement Agreement does not refer to personal physical injuries or physical sickness at all. Rather, the agreement indicates that the $700,000 payment was made primarily in return for the Romans' timely vacating the apartment. Specifically, the Settlement Agreement says that the $700,000 would be paid to Ms. Roman "[u]pon [the Romans'] timely vacating the Premises by on or before September 26, 2013." Then, a few paragraphs later, the Settlement Agreement says that, if the Romans failed to timely vacate the apartment, Ms. Roman "will not be entitled to receive the payment . . . but the other provisions of this Agreement, including the provisions relating to dismissal [of the various legal actions] and the mutual releases . . . , shall be fully enforceable without limitation." These provisions, in no uncertain terms, condition the $700,000 payment on the Romans' moving out.

Moreover, the facts and circumstances surrounding the Settlement Agreement leave no doubt that Jefferson and Greystar intended to compensate the Romans primarily for moving out and not for physical injuries or sickness. The timing of the Settlement Agreement, the testimony of Mr. Renard, and the Purchase and Sale Agreement between Jefferson and BRE confirm this. First, in spite of the Romans' ongoing legal disputes with Jefferson and Greystar, the decision to offer the Romans $700,000 was made only when it became necessary for Jefferson to finalize the sale of the Apartments to BRE.[6] Second, Mr. Renard credibly testified about the circumstances surrounding the decision to settle. BRE had expressed concerns about the Romans' residing in the Apartments because of past litigation it had with them and "wanted the Romans to vacate the property and to release any claims against the property." Trial Tr. 30:7–9. Consequently, Jefferson made the decision to offer the Romans a settlement to close the sale to BRE. The Purchase and Sale Agreement between Jefferson and BRE confirms Mr. Renard's testimony. In relevant part, that agreement required Jefferson to "confirm[] to [BRE's] reasonable satisfaction that [the Romans] are no longer tenants at the

---

[6] Before this offer, the record indicates that a significantly lower offer of $50,000 (and perhaps another offer of $150,000) was made to ensure the Romans would vacate the Apartments and drop their legal claims. The Romans rejected these offers, and there is no indication in the record that the offers were intended to settle claims of personal physical injury or physical sickness.

**[\*16]** Property . . . and that [Jefferson] has settled the outstanding litigation with the Romans relating to the Property."

The Romans argue that the payment was made at least in part to settle the various legal actions they brought against Jefferson and Greystar, including any future claims they may have had.[7] From this premise, the Romans conclude that the payment was for physical injury or sickness. But for multiple reasons this conclusion does not follow.

To start, nothing in the record suggests that Jefferson and Greystar were on notice of any material liability for personal physical injuries or sickness of the Romans (within the meaning of section 104(a)(2)). For example, among the Romans' pending actions against Jefferson and Greystar were the cross-appeal in the unlawful detainer action Mr. Roman filed, the privacy lawsuit Ms. Roman filed, and the DFEH complaint Mr. Roman filed. These actions involved numerous complaints against Jefferson and Greystar including, among others, discrimination, harassment, privacy violations, noise, retaliation, and other fair housing violations. Yet we see no complaint in the many documents the parties introduced in which the Romans sought damages for personal physical injuries or sickness. To the extent any maladies were alleged in a complaint, they appear to be more in the nature of emotional distress allegedly suffered by the Romans. Section 104(a) explicitly says that amounts related to emotional distress do not fall within the exclusion to gross income under subsection (a)(2).[8]

Nor can the Romans prevail in arguing that the general waiver clause contained in the Settlement Agreement settled any claims of personal physical injuries or physical sickness they may have had against Jefferson and Greystar. In response to such arguments, our Court has stated time and again that "all settlement proceeds are included in gross income where there is a general release but no allocation of settlement proceeds among various claims." *Doyle*, T.C. Memo. 2019-8, at \*15 (quoting *Molina*, T.C. Memo. 2013-226, at \*12);

---

[7] We note, however, that at least part of the consideration for dropping the legal claims was a mutual release of legal claims Jefferson and Greystar had against the Romans.

[8] The Romans assert that their documents prove their personal physical injuries or physical sickness, but we look to the nature of the claims underlying the Settlement Agreement to determine why the Romans were compensated. *See Burke*, 504 U.S. at 237. Additionally, the Settlement Agreement's integration clause limits the agreement to its express terms and supersedes any prior negotiations by the parties.

**[\*17]** *see also, e.g.*, *Tillman-Kelly*, T.C. Memo. 2022-111, at \*6; *Ahmed v. Commissioner*, 2011 WL 6440130, at \*3; *Connolly v. Commissioner*, T.C. Memo. 2007-98, 2007 WL 1201543, at \*3; *cf. Simpson*, 141 T.C. at 341 (relying on attorney's testimony to interpret a general release provision). Moreover, we have also explained that general, *prospective* waivers are inadequate to show that a settlement payment was made for a physical injury. *See, e.g.*, *Smith*, T.C. Memo. 2018-127, at \*18 n.5.

More generally, while the Romans each gave testimony about various physical ailments they suffered from, they have not shown the nexus between such ailments and the $700,000 payment. Virtually all of Mr. Roman's ailments were unrelated to living at the Apartments. And to the extent the Romans argue that Mr. Roman's ailments were exacerbated by any noise from the building or stressors caused by living at the building, the Romans have not demonstrated that any claim for physical injuries against Jefferson or Greystar was considered when the Settlement Agreement was executed. Although Ms. Roman testified that she began experiencing panic attacks, depression, anxiety, and migraines on account of noise from a neighboring apartment, her claims appear to have been more in the nature of emotional distress, which are explicitly excluded from section 104(a)(2). *See* I.R.C. § 104(a) (flush text). Finally, although Ms. Roman testified that she injured herself while moving out of the Apartment, she made no claim that the injury resulted from any actions or inactions on the part of Jefferson or Greystar. Therefore, the Romans' recitation of their various ailments does nothing to support the argument that the $700,000 was compensation for personal physical injuries or physical sickness.[9] *See, e.g.*, *Blum v. Commissioner*, T.C. Memo. 2021-18, at \*10 (explaining that mere "but for" causation is insufficient to make section 104(a)(2) applicable because, as "[b]oth we and the Court of Appeals for the Ninth Circuit have explained, . . . a taxpayer 'must show that there is "a direct causal link between the damages and the personal injuries sustained"'" (quoting *Doyle*, T.C. Memo. 2019-8, at \*11)), *aff'd*, No. 21-71113, 2022 WL 1797334 (9th Cir. June 2, 2022).

As the Romans have not demonstrated that the proceeds from the Settlement Agreement were paid on account of personal physical injuries or physical sickness, the proceeds are includible in gross income.

---

[9] We also note that, even if Mr. Roman were compensated on account of his various physical injuries, we do not see why any money paid to Ms. Roman would escape taxation under section 104(a)(2) as the statute excludes only amounts attributable to "personal" physical injuries or physical sicknesses.

**[\*18]** Next we turn to how the $700,000 should be allocated between the Romans.

III.    *Allocation of Agreement Proceeds Between the Romans*

The Commissioner's theory of the case is that Mr. Roman and Ms. Roman each received half of the agreement proceeds and that Mr. Roman then transferred his share to Ms. Roman as compensation for services she provided him as a live-in caregiver. Under this theory, Mr. Roman's gross income for 2013 should include $350,000 from the agreement proceeds and Ms. Roman's gross income should include $700,000—$350,000 from the agreement and $350,000 as payment for services. Ms. Roman appears to argue that, if the payment is taxable, it should be allocated to Mr. Roman, and she disagrees with the Commissioner regarding the $350,000 payment for services. On the other hand, Mr. Roman contends that none of the payment should be allocated to him and that it all belonged to Ms. Roman. For the reasons we now describe, we find that, even though the full $700,000 was paid to Ms. Roman, the Romans each have gross income of $350,000 attributable to the payment. And we disagree with the Commissioner that Ms. Roman had an additional $350,000 of income from services.

In general, income is taxable to the person who earns it. *See Helvering v. Horst*, 311 U.S. 112, 116–18 (1940); *Lucas v. Earl*, 281 U.S. 111, 114–15 (1930). Under this Court's precedent, as well as that of the Ninth Circuit, determining the true earner of income is a question of who "controls the earning of the income rather than the question of who ultimately receives the income." *Vercio v. Commissioner*, 73 T.C. 1246, 1253 (1980); *see also Sparkman v. Commissioner*, 509 F.3d 1149, 1158 (9th Cir. 2007), *aff'g* T.C. Memo. 2005-136. Accordingly, and as the Supreme Court has explained, "[a] taxpayer cannot exclude an economic gain from gross income by assigning the gain in advance to another party." *Commissioner v. Banks*, 543 U.S. 426, 433 (2005).

This longstanding principle has been applied in a number of contexts. For example, the Supreme Court has held that salaries are taxed to those who earn them (i.e., the employee who performs the relevant services) and "that the tax [cannot] be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it." *Lucas v. Earl*, 281 U.S. at 115. Similarly, the Court has explained that income from income-producing assets is taxed to the person "who owns or controls the source of the income" rather than the recipient,

**[\*19]** because the person who owns or controls the income source also "controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants." *Helvering v. Horst*, 311 U.S. at 116–17; *see also Commissioner v. Banks*, 543 U.S. at 434. In other words: "The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment and hence the realization of the income by him who exercises it." *Helvering v. Horst*, 311 U.S. at 118.

Applied to these cases, these authorities require a 50/50 allocation of the $700,000 payment between Ms. Roman and Mr. Roman. As we have explained, the $700,000 was paid primarily in exchange for the Romans' vacating the Apartments. If either had failed to move out, the amount would not have been paid. Thus, vacating the Apartments was an act both Ms. Roman and Mr. Roman performed, in equal measure, to earn the payment. *See Lucas v. Earl*, 281 U.S. at 114–15 (income is taxed to the person who earns it); *see also Helvering v. Horst*, 311 U.S. at 118 (when an assignment of income precedes the rendition of services, the person who performs the services is the person who has the power to dispose of the income (i.e., the true earner)).

Further, to the extent that any portion of the payment was attributable to the Romans' release of their current and future claims against Jefferson and Greystar, this too supports a 50/50 allocation. At the time they signed the Settlement Agreement, both Ms. Roman and Mr. Roman had pending claims against Jefferson and Greystar. Moreover, both Mr. Roman and Ms. Roman had rights under Mr. Roman's lease that could give rise to future claims. Thus, any amounts attributable to relinquishing the Romans' current and future claims are attributable to both of them. *See Commissioner v. Banks*, 543 U.S. at 435 (noting that, in the litigation recovery context, "the income-generating asset is the cause of action that derives from the plaintiff's legal injury").

Mr. Roman contends that none of the income should be attributed to him because he neither wanted it nor received it. He saw the settlement payment as "a form of punishment," Trial Tr. 174:18, and did not "like people to abuse just because [they] have the power to abuse," Trial Tr. 174:7–8. But neither a taxpayer's motives nor the absence of actual receipt is relevant under the governing caselaw. Practically all assignment of income cases involve taxpayers who, of their own volition, arrange for someone else to receive income the taxpayer has earned or

**[\*20]** will earn. Dating all the way back to 1930, courts have rejected motives-based arguments. *See Lucas v. Earl*, 281 U.S. at 115 ("[N]o distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew."); *see also, e.g.*, *Commissioner v. Banks*, 543 U.S. at 434 ("[W]e do not inquire whether any particular assignment has a discernable tax avoidance purpose."). And, in any event, Mr. Roman's professed motives of punishing Jefferson and Greystar and "taking care of" Ms. Roman are in no way inconsistent with an assignment of income finding.[10]

Finally, to the extent the Commissioner argues that Mr. Roman paid his share to Ms. Roman as compensation for services, we disagree. Although there is no dispute that Ms. Roman was Mr. Roman's caregiver at the time she received the payment, the State of California paid her separately for providing care. Additionally, by residing with Mr. Roman during the relevant years as his caregiver, Ms. Roman appears to have shared, at least indirectly, in some of his government housing benefits. We see no evidence that Mr. Roman owed Ms. Roman any additional backpay or wages on account of her caregiving. For these reasons, we find that $350,000 was not paid to Ms. Roman as compensation for services. To the extent any portion of Mr. Roman's share was truly transferred to Ms. Roman for her exclusive use (as opposed to, for example, being paid to her with the understanding that the amount ultimately would be used for Mr. Roman's benefit as well), *see supra* note 10, it would appear to have been in the nature of a gift.

In summary, we conclude that each of Mr. Roman and Ms. Roman earned $350,000 of the settlement proceeds and each should include that amount in gross income.

---

[10] At trial, the Court invited Mr. Roman to explain why he had been willing to execute the Settlement Agreement even though none of the proceeds would go to him. He responded: "Once you think you know something, someone or something is going to take care of you, . . . you don't have to worry. How to explain? I don't like to have overheads. So for me, it was better like this." Trial Tr. 175:16–20. He continued: "It's like someone [you] make a pact with – I take care of you; you take care of me – who's [to] die first or something like that. I said, yeah, okay. No problem." Trial Tr. 175:22–25.

[*21] IV.    *Ms. Roman's Liability for Substantial Understatement of Income Tax Penalty Under Section 6662*

A.    *The Commissioner's Burden of Production*

Having determined that Ms. Roman received taxable income of $350,000 for 2013, we now consider whether she is liable for the section 6662 penalty the Commissioner determined.

Section 6662 imposes an accuracy-related penalty equal to 20% of the portion of any underpayment of tax required to be shown on a return that is attributable to any substantial understatement of income tax. *See* I.R.C. § 6662(a) and (b)(2). An understatement of income tax is "substantial" if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or "$5,000." I.R.C.§ 6662(d)(1)(A).

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). The record shows that Ms. Roman's understatement of income tax for 2013 exceeded the threshold amount under section 6662(d)(1)(A), so the Commissioner has met his burden to show the penalty under section 6662(a) was proper when the notice of deficiency was issued.

The Commissioner must also show compliance with the procedural requirements of section 6751(b)(1). *See* I.R.C. § 7491(c). Section 6751(b)(1) provides that no penalty shall be assessed unless "the initial determination" of the assessment was "personally approved (in writing) by the immediate supervisor of the individual making such determination." The statute, in relevant part, includes an exception to this rule for "any other penalty automatically calculated through electronic means." I.R.C. § 6751(b)(2)(B); *see also Walquist*, 152 T.C. at 69. The record in these cases demonstrates that the Commissioner automatically calculated the section 6662 penalty asserted against Ms. Roman through electronic means, and Ms. Roman has not offered any contrary arguments or evidence. Therefore, no written approval was required under section 6751. Accordingly, unless Ms. Roman's underpayment of tax was attributable to reasonable cause and good faith, she is liable for the penalty. *See* I.R.C. § 6664(c)(1).

**[\*22]** B.     *Reasonable Cause and Good Faith*

No penalty is imposed under section 6662 with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to [it]." I.R.C. § 6664(c)(1). Ms. Roman has the burden to establish that she is excused from the penalty for reasonable cause. *See United States v. Boyle*, 469 U.S. 241, 245 (1985); *see also Cooper v. Commissioner*, 877 F.3d 1086, 1095 (9th Cir. 2017), *aff'g* 143 T.C. 194 (2014).

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances, including the taxpayer's efforts to assess the proper tax liability as well as the taxpayer's knowledge, experience, and education. *See Gerhardt v. Commissioner*, No. 11127-20, 160 T.C., slip op. at 33–34 (Apr. 20, 2023); *see also* Treas. Reg. § 1.6664-4(b)(1).

Ms. Roman's primary argument for why she should not be liable for the section 6662 penalty is that an attorney allegedly counseled her in 2009 that "settlement proceeds for housing discrimination are not taxable." Pet'r's Opening Br. 52. Relatedly, she says that she has "never reported any prior settlement proceeds . . . and the IRS never served her with [a notice of deficiency] for any of those tax years." *Id.*

To begin, Ms. Roman has not directed us to any evidence that supports that she sought out the advice of an attorney in 2009, nor have we found any such evidence in the record. Accordingly, under Rule 143(c), we cannot rely on the statements made in her brief concerning the matter.

Moreover, even assuming that she did speak with an attorney, to show that reliance on an attorney constitutes reasonable cause, Ms. Roman would need to show that her reliance was reasonable. *Boyle*, 469 U.S. at 250–51; Treas. Reg. § 1.6664-4(b)(1) ("[A taxpayer's reliance on] professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."). Our Court applies a three-prong test to determine whether a taxpayer reasonably relied on professional advice. Specifically, we analyze whether "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser,

**[\*23]** and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *see also Cooper v. Commissioner*, 877 F.3d at 1095.

Ms. Roman has produced no evidence that the advice she alleges to have received was from a competent professional advising her on her federal tax obligations rather than her state tax reporting obligations. And Ms. Roman contends that she consulted the attorney in an earlier year, presumably about a different settlement. She does not claim to have consulted any adviser about the amount paid here. Moreover, given the nature of the advice Ms. Roman purportedly received from the attorney on a relatively straightforward federal tax issue, we question whether the attorney was in fact a competent professional or whether Ms. Roman's reliance on the purported advice would have been reasonable. Ms. Roman has demonstrated throughout these cases that she is sophisticated in legal matters, and a simple search would have contradicted the purported advice. In any event, because Ms. Roman did not produce sufficient evidence about the advice she received, she fails to satisfy the three-prong test.[11]

Lastly, Ms. Roman seems to argue that the substantial understatement of income tax penalty entails a willfulness requirement. Specifically, she says that the Commissioner "cannot possibly carry [his] burden that she somewhat wi[l]lfully misstated her income for 2013 . . . when she filed her return." Pet'r's Opening Br. 54. The problem for Ms. Roman is that there is no willfulness requirement in section 6662. So this argument is without merit.

Because Ms. Roman has failed to show that her underpayment of tax was due to reasonable cause and made in good faith, we conclude that she is liable for the section 6662 penalty.

V.  *Mr. Roman's Liability for Failure to File Addition to Tax Under Section 6651(a)(1)*

Finally, we must determine whether Mr. Roman is liable for the failure to file a timely return addition to tax under section 6651(a)(1).

---

[11] And, of course, the fact that Ms. Roman has failed to report similar settlements in the past does not support the view that her underpayment in 2013 was due to reasonable cause.

24

[*24] Section 6651(a)(1) imposes an addition to tax for failure to file a timely return unless the taxpayer proves that such failure is due to reasonable cause and not willful neglect. *Wheeler v. Commissioner*, 127 T.C. 200, 207 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008). The addition to tax is equal to 5% of the amount required to be shown on a taxpayer's return for each month the failure to file continues, but is not to exceed 25% of the amount required to be shown on the return in total. I.R.C. § 6651(a)(1).

As discussed above with respect to the section 6662 penalty, under section 7491(c), the Commissioner also bears the burden of production with respect to the liability of an individual for any addition to tax. *See Higbee*, 116 T.C. at 446. The parties stipulated that Mr. Roman did not file a return for his 2013 taxable year until October 26, 2015, which was more than a year and a half after the return was due, so the Commissioner's burden of production under section 7491(c) is met.

Once the Commissioner has met his burden of production, the taxpayer bears the burden of proving that the late filing was due to reasonable cause and not willful neglect. Rule 142(a); *Higbee*, 116 T.C. at 447. Mr. Roman's only argument to explain why he did not file a return by the due date is that he believed, mistakenly, that the payment pursuant to the Settlement Agreement was not taxable income to him and therefore his gross income for the 2013 taxable year was zero. An individual generally must file a tax return if the individual's gross income exceeds the sum of the personal exemption amount and the standard deduction for a given year. I.R.C. § 6012(a)(1)(A)(i). For 2013, that sum was $10,000 for an individual under 65. A taxpayer who deliberately does not file a return "must use reasonable care to ascertain that no returns were necessary." *Beck Chem. Equip. Corp. v. Commissioner*, 27 T.C. 840, 860 (1957). As we discussed above, Mr. Roman earned $350,000 of the payment from the Settlement Agreement, which far exceeds the threshold amount for filing a return, and Mr. Roman has not demonstrated that he used reasonable care to ascertain that he was not required to file a return. Therefore, Mr. Roman's mistaken belief that he did not owe tax for his 2013 taxable year does not give us a basis for concluding that his failure to timely file a return was due to reasonable cause and not willful neglect.[12] *See, e.g.*,

---

[12] Any argument that Mr. Roman did not file a return because he did not receive a Form 1099 similarly fails because he knew of the facts underlying the

**[\*25]** *Probandt v. Commissioner*, T.C. Memo. 2016-135, at \*39–40; *Evans v. Commissioner*, T.C. Memo. 2016-7, at \*45–46; *Trask v. Commissioner*, T.C. Memo. 2010-78, 2010 WL 1507314, at \*9.

Although Mr. Roman says in his posttrial brief that he eventually consulted an attorney in the fall of 2015 with respect to his filing obligations for his 2013 taxable year—well after the return was due—the attorney advised him to file a return. Therefore, any argument that Mr. Roman sought out the advice of a professional adviser in determining his tax filing obligations does not support his assertion that his failure to file was due to reasonable cause and not willful neglect. Therefore, Mr. Roman has not met his burden to show why he should be excused from the addition to tax. Accordingly, we conclude that he is liable for it.[13]

VI.   *Conclusion*

As discussed above and after taking into consideration the Commissioner's concessions, we find that Ms. Roman earned gross income of $350,000 for 2013 in connection with the Settlement Agreement and is liable for an accuracy-related penalty under section 6662. Similarly, Mr. Roman earned gross income of $350,000 for 2013 in connection with the Settlement Agreement and is liable for the addition to tax under section 6651(a)(1).

We have considered all of the parties' arguments and, to the extent not discussed above, conclude they are irrelevant, moot, or without merit.

---

payment at the time and has not shown that he made any effort to confirm his belief that he was not required to file a return.

[13] For the first time in the Romans' Reply Brief, Mr. Roman appears to argue that his failure to file a timely return was attributable to reasonable cause on account of his disabilities. Pet'r's Reply Br. 13. The argument is untimely. *See Taiyo Hawaii Co. v. Commissioner*, 108 T.C. 590, 607 (1997). But even if we were to consider it on the merits, Mr. Roman has not shown how his disabilities prevented him from complying with his tax filing obligations for 2013. *See Thomas v. Commissioner*, T.C. Memo. 2005-258, 2005 WL 2860497, at \*3 ("For illness or incapacity to constitute reasonable cause, [the taxpayer] must show that she was incapacitated to such a degree that she could not file her returns." (citing *Williams v. Commissioner*, 16 T.C. 893, 905–06 (1951))); *see also Rayhill v. Commissioner*, T.C. Memo. 2013-181 (same); *Joseph v. Commissioner*, T.C. Memo. 2003-19 (same). Indeed, the record supports the conclusion that Mr. Roman did not file a timely return because he thought, mistakenly, that he was not required to.

**[\*26]** To reflect the foregoing and the concessions of the parties,

*Decisions will be entered under Rule 155 in Docket No. 10878-16 and for respondent in Docket No. 7671-17.*